## Coleman v. McIntosh.

(Decided May 23, 1919.)

### Appeal from Todd Circuit Court.

1. Breach of Marriage Promise—Breach of Contract—Evidence—Sufficiency.—In an action for breach of a marriage promise, evidence examined and held to sustain a verdict for plaintiff.

2. Breach of Marriage Promise—Evidence—Letter—Authentication. In an action for breach of a marriage promise, a letter contained in an envelope addressed to a young man who had boarded at plaintiff's home, if containing statements relevant to the facts in issue, was admissible upon proof that it was in the handwriting of plaintiff, and the jury believed that it was written by her, although the letter itself was not addressed to anyone, nor signed by anyone, and the person to whom the envelope was addressed was not introduced as a witness, and it was not shown how the defendant obtained possession of the letter.

3. Breach of Marriage Promise—Evidence—Letter—Admission Against Interest.—Such a letter containing the following, "You asked me if I had ever been engaged to anybody. Yes, when I was 17—I was getting ready to marry and the boy died in Texas, so that ended it," was admissible as an indirect admission that she had never been engaged to anyone except the boy who died in Texas.

4. Breach of Marriage Promise—Evidence—Letter—Admissibility.—In an action for breach of a marriage promise, a letter bearing

evidence of the fact that plaintiff had almost completely recovered from the distress of mind caused by defendant's failure to marry her was admissible on the question of damages.

5. Appeal and Error—Evidence—Letter—Exclusion.—Where an action for breach of a marriage promise was a close one on the facts, a refusal of the court to admit such letter in evidence, if the jury believed it to be genuine, was prejudicial error.

SELDEN Y. TRIMBLE, TRIMBLE & BELL, PETRIE & STANDARD for appellant.

JAMES R. MALLORY for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

In this action for breach of promise to marry, plaintiff, Hazel McIntosh, recovered of the defendant, Sam B. Coleman, a verdict and judgment for $3,000.00. Defendant appeals.

According to plaintiff's evidence she was twenty-two years of age and lived in Elkton. Plaintiff wanted to find out something about a school in Lexington, and defendant first came to see her the latter part of March, 1916, at her request. From that time on he visited her regularly three or four times a week and always on Sunday, and took several meals with the family. At that time he was engaged in concrete work. At first she did not care for defendant, but afterwards grew fond of him. They attended church, the Chautauqua and other entertainments together. They also visited some of her relatives and defendant gave her many presents. He first proposed to her in July, 1916. She did not then accept, but did tell him, on Sunday night, August 13th, that she would marry him. It was then agreed that they would be married in November. She wore his diamond ring, but when she first got it he told her that he was not going to give it to her for a while, but would lend it to her. He did give it to her the night they became engaged. She made some trips on transportation furnished by the defendant at his suggestion. Defendant continued to visit her up until he was married in January, 1917, and had two engagements with her after his marriage took place. Plaintiff's younger sister testified that she and defendant would be playing or scuffling and he would tell her that she would want to come out and see her sister when he married her, and he wouldn't let her. Plaintiff's

mother testified to the number of calls defendant made at her home and to the number of meals that he took there. She also says that she heard him tell her little girl that when her sister came out to his home she would want to come out and spend a week, and he wouldn't allow her to come.

Defendant testified that he was thirty-seven years of age and a farmer. He first went to see plaintiff at her request. She wanted to find out something about a Lexington school and he told her he would learn and advise her. Plaintiff asked him to get her a pass to Lexington. She then wrote and asked for transportation to Louisville. She and her cousin came to Frankfort on transportation furnished by him. Her father had a rock quarry on his place and together they operated a rock crusher. This was near plaintiff's home and he frequently stopped at the house. He never had dinner there on Sunday, but did eat several cold suppers. He never proposed to plaintiff in July or August or at any other time, and never became engaged to her. He did let her wear his ring, but though she asked him several times to give it to her, he declined to do so. The only one who ever mentioned marriage was the plaintiff herself, and when she did so he told her that he was not thinking about marrying. He never at any time told plaintiff's sister that he was going to marry plaintiff. He did make plaintiff presents, but it was because she asked for them. Clint Butler, the postmaster, testified that plaintiff applied for a position in the postoffice in the month of December, 1916. Mrs. Jesse Price testified that she saw plaintiff with defendant's ring on, and she stated that defendant was letting her wear it. Witness also stated that she had a conversation over the telephone with plaintiff after the defendant's marriage, and she stated that she didn't know why defendant had treated her that way as she had no strings on him.

In rebuttal plaintiff denied the conversation with Mrs. Price and also certain statements made by the defendant.

It will thus be seen that plaintiff testified that defendant promised to marry her and the testimony is corroborated to a certain extent by other witnesses. On the other hand, defendant emphatically denies that he ever promised to marry plaintiff and there are certain circumstances which tend to support his statements. In

view of the sharp conflict in the evidence, the question was for the jury and we cannot say that its finding was flagrantly against the evidence.

Another ground urged for reversal is the refusal of the trial court to permit the following letter to be read in evidence:

"Wednesday Eve.

"My Dearest Sweetheart:

"I recd your most welcome letter à few minutes ago. I was so glad to hear from you once more. Sweetheart, I am so sorry I can't see you. You know I would if I could but it is impossible. You don't know how I am situated. In answer to your questions, first I do love you better than any other boy. Second, I am not engaged to the soldier whom you speak of and never was or never will be. He is only a school chum and besides he has tuberculosis. I can prove any day you ask me I am not engaged to anybody and especially to the soldier. Yes I will marry you if you do not go to the war, but first promise me you will go to Cal. For several reasons. I will tell you when I see you. You asked me if I had ever been engaged to anybody. Yes, when I was 17— I was getting ready to marry and the boy died in Texas so that ended it. I must have a business course before I marry for this reason. The world is in war and even if you don't go now you may in a year or so and then I could not work as I would have no education. I have ans all your questions as near as I could, but listen Sweetheart don't give me anything unless you trust me. That is one question I also ask you. You asked me how much I would need. I have a little but I am compelled to borrow five hundred and seventeen dollars—$500.17, unless you will loan it to me. I have it all figured out, unless you will loan it to me it will take me four years to pay it and the interest back to the bank. Let me have what you want to. I will not ask you to give me a ring if you will do this. Of course I would like to have an engagement ring but all is asking too much of you. Put it in a box of writing paper in an envelope about middle ways. I hope I can see you soon. I must close as it is mail time. Written by one that loves you best of all. Sweetheart, why don't you put me in a stamp. I would not have them catch me for the world. Write soon. With love to you."

This letter was contained in an envelope addressed to Mr. John W. Barnes, Nashville, Tennessee, General Delivery. The postmark, though blurred, bears the date, February 14, 1918, and sufficient marks to indicate that it was received through the postoffice at Nashville, Tennessee, on that date. While plaintiff was on the stand she testified as follows:

"Q. Miss Hazel, do you know John W. Barnes? A. I do not. There was some boy stayed out home, boarded there about three weeks. Q. Was his name John W. Barnes? A. I don't know whether it was or not. Q. What business was he engaged in? A. I can't tell you. Q. I want to ask you if you didn't write that letter to John W. Barnes? A. I did not write that letter. He boarded out home about three weeks, I guess."

When defendant was on the stand he testified that he knew plaintiff's handwriting and that the letter was in her handwriting. The letter was then offered in evidence. We do not regard as of controlling importance the fact that the letter itself was not addressed to anyone; that it was not signed by anyone; that John W. Barnes was not introduced as a witness, or that it was not shown how the defendant obtained possession of the letter. 10 R. C. L., sec. 351, p. 1148. Though uncertain at first whether she knew John W. Barnes, plaintiff finally stated that he boarded at her home for about three weeks. The letter was contained in an envelope addressed to him. The letter purports to be addressed to the writer's sweetheart. Hence, if the letter was genuine, and there was sufficient evidence to make this a question for the jury, the letter was admissible provided it contained statements otherwise relevant to the facts in issue. It will be observed that the letter contains the following: "You asked me if I had ever been engaged to anybody. Yes, when I was 17—I was getting ready to marry and the boy died in Texas, so that ended it." It is argued that this statement was in no wise an admission that plaintiff had never been engaged to anyone else. It is not necessary that the admission should be direct, but it may be indirect, as where it bears on the issue incidentally or circumstantially. Beattyville Coal Co. v. Hoskins, 19 Ky. Law Rep. 1759, 44 S. W. 363, 16 Cyc. 942. While it is true that the writer of the letter did not say in terms that she had never been engaged to anyone else except the boy who died in Texas, it cannot be doubted that that was the im-

pression she sought to make upon the person to whom the letter was addressed, and that being true, it was for the jury to say what effect should be given to the language used. The letter was also admissible on the question of damages, for if written by the plaintiff, it bears evidence of the fact that she had almost completely recovered from the distress of mind caused by defendant's failure to marry her. Gardner v. Arnett, 21 Ky. Law Rep. 1, 50 S. W. 840.

Since the case was a close one on the facts, we conclude that the refusal of the trial court to admit the letter in evidence, if the jury believed it to be genuine, was prejudicial error.

Other grounds for reversal are relied on but we deem it unnecessary to discuss them.

Judgment reversed and cause remanded for new trial consistent with this opinion.